874 F.2d 20
 25 Soc.Sec.Rep.Ser. 443, Medicare&Medicaid Gu 37,849,
28 Fed. R. Evid. Serv. 223
UNITED STATES of America, Appellee,
v.
BAY STATE AMBULANCE AND HOSPITAL RENTAL SERVICE, INC. and
Michael G. Kotzen, Defendants, Appellants.
UNITED STATES of America, Appellee,
v.
John L. FELCI, Defendant, Appellant.
 Nos. 88-1866, 88-1867.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 8, 1989.
Decided May 2, 1989.
As Amended May 9, 1989.
 
 Nancy Gertner, with whom Gail S. Strassfeld, Sharon Beckman, Silverglate, Gertner, Fine & Good and Philip Cormier, Boston, Mass., were on brief for defendants, appellants, Bay State Ambulance and Hosp. Rental Service, Inc. and Michael G. Kotzen.
 Margaret A. Burnham, Boston, Mass., with whom Martin C. Gideonse was on brief for defendant, appellant, John L. Felci.
 Peter A. Mullin, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for the U.S.
 Before BOWNES and TORRUELLA, Circuit Judges, and COFFIN, Senior Circuit Judge.
 BOWNES, Circuit Judge.
 
 
 1
 This case arises out of the award of a contract for ambulance service to defendant, Bay State Ambulance and Hospital Rental Service, Inc. (Bay State), by the City of Quincy in 1984. The United States indicted Bay State, its president, Michael G. Kotzen, and John L. Felci, an official at the Quincy City Hospital (QCH), of conspiring to commit Medicare fraud (Count 1). 42 U.S.C. Sec. 1395nn.[1] The defendants were also charged with illegally paying Felci in the form of a Buick (Count 2), a Mazda (Count 4) and seven checks (Counts 3 and 5-10) in violation of the same statute.[2] The jury found the defendants guilty of Counts 1 (the conspiracy), 2 (the Buick) and 4 (the Mazda). The jury was hung on Count 3 and returned a verdict of not guilty on Counts 5 through 10. The defendants appeal on numerous grounds.[3] For the reasons set forth below, we affirm their convictions.
 
 I. FACTS
 
 2
 "Our review of the facts is made in the light most favorable to the government and drawing all reasonable inferences in its favor." United States v. Foley, 871 F.2d 235, 236 (1st Cir.1989). Because it is relevant to certain issues, we also give the defendants' version of certain events.
 
 
 3
 (a) Bay State Is Awarded The Contract
 
 
 4
 Quincy City Hospital is a city-owned hospital which is managed by the Hospital Corporation of America (HCA). With the exception of a handful of top administrators, who are employees of HCA, all QCH employees are city employees; Felci was a city employee at all relevant times. Bay State is an ambulance company which provides mainly front-line service[4] to a number of Massachusetts communities. Kotzen is the president and sole shareholder of Bay State. He is also the president and sole shareholder of two other corporations: Bay State Ambulance Sales, Inc. and B & N Realty, Inc. Bay State Ambulance Sales, Inc. (Sales Corp.) is in the business of buying and selling ambulances and other vehicles; Kotzen is a licensed car dealer. B & N Realty is a real estate corporation which holds most of the property owned by Bay State. Neither Sales Corp. nor B & N Realty has any employees, payroll or separate headquarters. But, all three companies have separate checking accounts and books.
 
 
 5
 In 1980, the City of Quincy decided to remove responsibility for ambulance service from the police department and put it in the private sector. Competitive bids were submitted in 1980, but no contract was awarded. After another round of bids in 1981, Bay State was awarded a zero-subsidy contract.[5] Brewster Ambulance Service had also bid for this and the 1980 contract.
 
 
 6
 The term for the 1981 contract was for three years with separate renewable contracts for each year. The contract was first administered by the Quincy City Purchasing Department; by 1983, the Quincy City Hospital Purchasing Department had been put in charge of administering the contract. At all times, however, Felci, as QCH's director of training, was responsible for the daily oversight of the contract.
 
 
 7
 In January, 1982, after receiving permission from the then Chief Executive Officer (CEO) of QCH, Michael Kitchen, Felci and Kotzen attended a conference in Kansas City on emergency medical care. All of Felci's expenses were paid by Bay State. In late 1982, a new QCH CEO, James Lowenhagen, concluded that Felci's conference attendance at Bay State's expense raised an appearance of impropriety and ordered, therefore, that Felci was no longer to have any decision-making power with respect to subsequent contracts on which Bay State might bid. Lowenhagen memorialized this order in a letter to Felci. Felci informed Kotzen of this development.
 
 
 8
 In late 1983, in response to a letter from Brewster Ambulance, QCH started the process for rebidding the ambulance contract due to expire June 30, 1984. Although QCH's CEO, Mark Mundy,[6] had the final decision-making authority as to whom the contract would be awarded, a committee was appointed to write the specifications, review the bids and make a recommendation. Agrippino Roccuzzo, QCH's Director of Material Management, recommended a list of people for the panel, which included Felci. Mundy approved the list. When Felci discovered he was on the bid committee, he talked to Roccuzzo about the Lowenhagen letter. Felci assured Roccuzzo that there was no need for concern other than the trip to Kansas City. Based on this assurance, Felci was kept on the committee. Felci failed to tell Roccuzzo that he had been hired by Kotzen as a consultant to Bay State and had been given a 1983 Buick Electra a few months earlier from Bay State Ambulance Sales, Inc., a corporation owned by Kotzen.
 
 
 9
 Because of Felci's intimate knowledge of the 1981 contract and its subsequent administration, Roccuzzo depended heavily on Felci in preparing information for the committee members. When the committee members were asked for suggestions for improving the bid specifications, only Felci submitted any (except for one financial change by the accounting department member). Felci's suggestions included: a requirement that the company have five years of front-line service; upgrading at least one ambulance to 24 hours a day Advanced Life Saving (ALS)[7] by October 1, 1984;[8] and cross-referenced computer generated statistics necessary to make ALS effective. All of Felci's suggestions were adopted.
 
 
 10
 Only two companies submitted bids for the contract: Bay State and Brewster Ambulance Service. Felci and Roccuzzo prepared synopses of the two companies' bids in a comparative format. Because of Felci's superior knowledge and experience, he played a significant role in drafting these documents. The Bay State synopsis is written in very approving terms. The Brewster synopsis raises a number of questions about their proposal. The summary sentence states: "While Brewster has, to a satisfactory degree, met all the bid specifications; they are basically the same company which bid on the proposal to deliver the City of Quincy with Emergency Medical Services three (3) years ago." The synopses were sent to the bid committee members.
 
 
 11
 In order to assess better the merits of both companies' bids, the bid committee gave each company time to make an oral presentation and to answer questions posed by the committee members. The presentations were held on the morning of April 23, 1984, with Brewster going first, followed immediately by Bay State. Immediately prior to Brewster's presentation, George Brewster, the company's manager, gave Roccuzzo a letter complaining that the contract specifications were too restrictive, that Bay State's rates were higher than Brewster's,[9] and that Bay State's reports were not presented in a professional manner.
 
 
 12
 Roccuzzo directed Felci to investigate and respond to each of the allegations contained in the Brewster complaint letter. Felci did so. The response, though written as the "REVIEW COMMITTEE'S RESPONSES" and signed by Roccuzzo, is in fact Felci's product. In the response, Felci stated that the specifications were not unduly restrictive and that Bay State's reports were fine. With respect to rate differences, Felci stated that "George Linah" (his name is spelled "Lynah") was contacted. Lynah worked for Blue Cross/Blue Shield of Massachusetts, and had responsibility for determining reasonable rates for ambulance companies under the Medicare program.[10] Lynah denied talking with anyone from QCH about rate differences. Although Felci's response was not circulated to the bid committee, it was used to placate a city councilman who inquired of the bid process after being contacted by Brewster. At this same time, Felci contacted Arthur Dove, a Bay State employee, and asked him to contact a political associate concerning the councilman's inquiries. Felci was concerned because there might be "a problem" with this councilman.
 
 
 13
 During both presentations, Felci was present but said little. One of the people who presented information during Bay State's presentation was William Gonsalves, a computer programmer.[11] Although Felci and Gonsalves were at that time jointly engaged in developing a computer program to meet the statistical requirements of the contract specifications, neither Felci nor Gonsalves informed the committee members of this fact.
 
 
 14
 Following Bay State's presentation, Felci gave John Mansfield, Bay State's executive director, a sealed envelope and told him not to open it until he was back at the office. When Mansfield opened it, he discovered a copy of the Brewster complaint letter. When Mansfield asked Kotzen about this, Kotzen told him to cooperate in any way Felci requested.
 
 
 15
 Following the oral presentations, Roccuzzo, with Felci's help, prepared a summary of the questions asked and the responses given. This document was sent to committee members along with the ballots for voting. The vote was unanimous for Bay State; Felci cast a vote. Every member of the committee who voted and who testified at trial, stated that Bay State had always been their number one choice because of its three years of prior service. The committee's recommendation was followed and the contract was awarded to Bay State. On May 23, 1984, the new contract was signed.
 
 
 16
 (b) The Relationship Between Felci and Bay State
 
 
 17
 The relationship between Felci and Bay State began with the 1981 contract. Felci was assigned the responsibility of overseeing that contract and thus had a lot of contact with Bay State and especially with Kotzen. In 1982, the incident involving the trip to Kansas City occurred, with the Lowenhagen letter following.
 
 
 18
 By the summer of 1983, Felci was working for Bay State as a consultant, as well as carrying on his regular duties at QCH. Felci worked for Bay State as a management consultant for two years. His main duties were training personnel and orchestrating and/or presenting seminars. Felci also developed an Early Awareness Program for Bay State. This was a program targeted at young children to inform them about ambulances and ambulance personnel and how to react if they were involved in a medical emergency. Initially, Felci prepared the program for QCH. After completing the project for QCH, Felci revised it to meet the needs of Bay State. Felci also investigated the feasibility of two projects Bay State was looking into: (1) the purchase of an ambulance service company in Florida and (2) entering the helicopter ambulance field. With respect to the former, Felci travelled to Florida, at Bay State's expense, in February of 1984.
 
 
 19
 The final area of work Felci performed for Bay State involved the use of computers for generating statistics. Felci and Gonsalves, a computer programmer, decided that there was a niche for a computer program specially geared to needs of ambulance companies. Felci and Gonsalves decided to work on this project with Gonsalves doing the actual programming and Felci working on marketing and determining the actual needs of ambulance companies. They tentatively decided to call any business entity to be formed EMSTAT. Although EMSTAT was never formally organized, Felci treated it as a business entity for certain purposes. Felci had Gonsalves work on a program that would meet the requirements of the QCH 1984 contract. Although Gonsalves wanted to market the program to many companies, he and Felci also discussed selling it exclusively to Bay State for between $10,000 and $20,000. During the development of the program, Felci asked Gonsalves not to tell anyone about his connection with EMSTAT. Gonsalves did not disclose Felci's role in the EMSTAT project. Gonsalves was concerned about being pressured to finish the project by July 1, 1984 (the date of the commencement of the 1984 QCH contract). The project was not completed by Gonsalves and he never received any money from it.
 
 
 20
 Felci received the following remuneration from Bay State at the following times: (1) June 1983, a 1983 Buick worth $14,200, which was offset by Felci trading in his Volvo, worth $7,800 resulting in a net value of $6,400;[12] (2) May 7, 1984, $770 check to EMSTAT drawn on Bay State's account;[13] (3) May 24, 1984, a Mazda worth $5,700;[14] (4) June 12, 1984, $1,000 check to EMSTAT from Bay State; (5) July 12, 1984, $1,200 check to EMSTAT from Bay State; (6) August 14, 1984, $1,640 check to EMSTAT from Bay State; (7) September 18, 1984, $1,600 check to EMSTAT from Bay State; (8) October 19, 1984, $1,600 check to EMSTAT from Kotzen;[15] and (9) November 23, 1984, $1,600 check to EMSTAT from Bay State.
 
 
 21
 The Mazda was purchased in New York City from an associate of Kotzen. Prior to receiving it, Felci told people he would be getting it but did not explain the Bay State connection. On the day Felci and Kotzen flew to New York to purchase the car, Felci was driven to the airport by an employee of Bay State. As the employee was about to drive away, he noticed Kotzen arrive. Kotzen did not speak to the employee and appeared to attempt to evade him. Upon returning with the Mazda, Felci again told people that he had purchased it and omitted the Bay State connection.
 
 
 22
 (c) The Investigation
 
 
 23
 The FBI began investigating Bay State in late 1984 for a different purpose but quickly picked up the trail leading to the indictment on Medicare Fraud. During the course of this investigation, the FBI requested any documents that Bay State had which would corroborate Bay State's contention that Felci was being paid only for actual work done for Bay State. Bay State, through its in-house counsel, Robert Shuman, asked Felci, who had already retained another attorney, for a list of all the times he worked on Bay State projects. Felci provided this list (hereinafter referred to as the Outline of Projects or Outline) to Shuman without informing his attorney of either its creation or its transmittal. Shuman thereafter provided the Outline to the FBI. The Outline contained numerous obvious and not-so-obvious errors. At trial, the government used this document extensively to undercut the defendants' claim that Felci was paid only for actual work done.
 
 
 24
 Prior to trial, Felci moved to exclude the Outline on the ground that it was prepared as part of a joint defense and therefore Shuman had no right to turn over the confidential information. In the alternative, Felci contended that at the time he prepared the document and gave it to Shuman, Shuman was acting as his attorney. The trial judge denied Felci's motion stating that the Outline had been produced pursuant to an FBI subpoena. When it was pointed out that the subpoena issued months after the Outline was given to the FBI, the judge affirmed her earlier ruling without further explanation.
 
 
 25
 (d) The Trial
 
 
 26
 At trial, the Outline and evidence of false or misleading statements made by defendants during the FBI investigation were highlighted. The government's theory of the case was that the payments to Felci were primarily improper inducements to help Bay State get the 1984 contract. Although the government did not attempt to link the payments to Felci as coming from Medicare funds received by Bay State or Kotzen, the parties stipulated that, on the basis of a sampling data for 1985 and 1986, Bay State received between $127,952 and $215,014 from Medicare funds for those years with the most likely amount being $171,883.
 
 
 27
 The defendants attempted to show that the payments were in fact reasonable amounts for actual services rendered. Government witnesses, as well as those called by defendants, testified that Felci did in fact perform services for Bay State, albeit less than the amount stated on the Outline of Projects. The defendants also called witnesses to describe work that needed to be done, that was done and that might have been done by Felci without anyone specifically knowing that he did it. Finally, defendants presented an expert who testified that the services Felci provided Bay State were worth more than Bay State paid Felci.
 
 
 28
 The jury returned a verdict of guilty against all three defendants on the conspiracy count and the substantive counts involving the automobiles. The jury could not agree on count 3 which involved the May 7 check in the amount of $770; a mistrial was entered on that count. The jury returned verdicts of not guilty for all three defendants on all other counts. Following the denial of post-trial motions and the sentencing of the defendants,[16] the defendants appealed.
 
 II. ADMISSION OF THE OUTLINE OF PROJECTS
 
 29
 Felci contends that the Outline of Projects was improperly admitted against him in violation of the attorney-client privilege.[17] The Outline was prepared by Felci after Shuman, Bay State's in-house counsel, requested documentation of the hours Felci worked for Bay State. Although Felci had already retained another attorney, Mr. Gideonse, Felci prepared the Outline and gave it to Shuman without telling Gideonse about it. Shuman then turned it over to the FBI. Later, after a subpoena had issued, Felci supplied Gideonse with substantially the same information in a letter which was not introduced at trial. It was not until even later, according to Gideonse's affidavit, that he was informed of the Outline of Projects and the events surrounding it. In contesting the admission of the Outline, Felci contends that Shuman had no right to turn over the Outline because either Shuman was acting as Felci's attorney (in addition to Gideonse) or the document was prepared as part of a joint defense. In either case Felci contends that the document was intended to be kept confidential and use of it by the government violated the attorney-client privilege.
 
 
 30
 A district court's determination regarding the existence of a privilege is factual in nature. United States v. Wilson, 798 F.2d 509, 512 (1st Cir.1986). Thus, "the district court's finding of no privilege can be overturned only if clearly erroneous." Id. In order to assert the attorney-client privilege with respect to a document provided by an attorney, the person asserting the privilege is
 
 
 31
 required to make four showings: (1) that he was or sought to be a client of [the attorney]; (2) that [the attorney] in connection with the [document] acted as a lawyer; (3) that the [document] relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding; and (4) that the privilege has not been waived.
 
 
 32
 Id. The burden of proving the existence of the privilege is on the party asserting the privilege. Id. at 512-13.
 
 
 33
 The evidence presented at the hearing on this issue amply supports the district court's finding that no attorney-client relationship existed between Felci and Shuman: Felci had retained separate counsel; Felci had contacted the FBI through his separate counsel; Felci never paid Shuman for his services; Felci never asked Shuman to take any action on his behalf. The most that can be said is that Felci had ongoing talks with Shuman concerning the investigation and that Shuman helped Felci polish the Outline and the subsequent letter to Gideonse containing the same information. On these facts, the district court did not make a clear error in finding no attorney-client relationship. Because Felci failed to meet his burden on the first prong of the test, we need not address the other three. Wilson, 798 F.2d at 512-13.
 
 
 34
 We turn now to Felci's alternative argument of joint defense. The joint defense privilege "is an extension of the attorney client privilege." Waller v. Financial Corp. of America, 828 F.2d 579, 583 n. 7 (9th Cir.1987).
 
 
 35
 The joint defense privilege protects communications between an individual and an attorney for another when the communications are "part of an on-going and joint effort to set up a common defense strategy." In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.
 
 
 36
 In re Bevill, Bresler & Schulman Asset Management Corp., 805 F.2d 120, 126 (3d Cir.1986) (citation omitted). "Communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests." Eisenberg v. Gagnon, 766 F.2d 770, 787-88 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985); see also United States v. McPartlin, 595 F.2d 1321, 1336 (7th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). To qualify for the privilege, the communication must have been made in confidence. See United States v. Keplinger, 776 F.2d 678, 701 (7th Cir.1985), cert. denied, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); United States v. Friedman, 445 F.2d 1076, 1085 n. 4 (9th Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). In addressing whether a given communication was meant to be confidential, what "the client reasonably understood" is "the key question." Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir.1984) (quoting McCormick on Evidence, Sec. 91 (1972)) (emphasis added). "[T]his circuit also looks to the intent of the client." Id. Finally, "it is well established that an appellate court must affirm a judgment of a district court if it is correct as a matter of law, even if for reasons other than those cited by the district court itself." United States v. Jodoin, 672 F.2d 232, 238 (1st Cir.1982).
 
 
 37
 The district court initially relied upon a clearly erroneous finding of fact in holding no joint defense privilege existed. The Outline was not transmitted to the FBI by Shuman pursuant to a subpoena. Once this was pointed out to the court, the judge reaffirmed her earlier ruling, but gave no reason.[18] Even assuming the district judge relied on incorrect grounds in finding no privilege, we affirm her ruling for two reasons, either of which is sufficient to defeat the privilege.
 
 
 38
 First, Felci failed to meet his burden of showing that the Outline was prepared as part of a joint defense. It is true that Felci, Kotzen and Bay State had many interests in common and thus much of the information shared by the parties would fall under the privilege. The Outline itself, however, does not fall into this category because it was not prepared as part of the joint defense. It is significant that Felci failed to consult his attorney about the Outline. Indeed, Felci did not provide his own attorney with the same information until months later. And, Felci did not inform his own attorney of the existence of the actual Outline and its subsequent travel until even after that time. When a person provides information to another without first consulting his own attorney, it is difficult to see how the information was given as part of a joint defense, even when the recipient may be viewed as a party with similar interests. The difficulty grows when the person furnishing the information fails to inform his attorney of what he has done for several months. This raises the inference that the information was not intended to be used for that person's defense much less a joint defense. Under these circumstances, the joint defense privilege is not available.
 
 
 39
 Second, there was no reasonable basis upon which to believe the communications would be kept confidential. At the hearing on this issue, Felci admitted that Shuman requested the information in order to address certain questions raised by the FBI. Under such circumstances, Felci could not have reasonably thought that the information would have been kept confidential. Although Felci might have subjectively thought otherwise, the "key question" is what was objectively reasonable under the circumstances. See Kevlik, 724 F.2d at 849. Here, Felci was told that Shuman wanted the information for one who clearly had an adverse interest in the information. There being no reasonable basis for believing that Shuman would not share the information in some form with the FBI, there can be no privilege.
 
 III. REASONABLE PAYMENT FOR ACTUAL WORK DONE
 A. Reasonable Payment Instruction
 
 40
 The trial court refused to give instructions requested by the defendants to the effect that the government had to show the payments to Felci were "not as compensation for services performed ... or were of substantially more value than the services performed or to be performed" and that Felci could not be guilty unless he was "substantially overpaid" for his services. Instead, the judge instructed
 
 
 41
 that the Government has to prove that the payments were made with a corrupt intent, that they were made for an improper purpose. If you find that payments were made for two or more purposes, then the Government has to prove that the improper purpose is the primary purpose or was the primary purpose in making and receiving the payments. It need not be the only purpose, but it must be the primary purpose for making the payments and for receiving them. You cannot convict if you find that the improper purpose was an incidental or minor one in making the payments.
 
 
 42
 This was part of the court's instruction on inducement. Although there is a question as to whether a proper objection was taken to this instruction, we will assume that it was.
 
 
 43
 The trial court did not err in not specifically instructing the jury that the government had to prove that the payments received were not reasonable for the actual work done. The gravamen of Medicare Fraud is inducement. Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient. We are impressed by the Third Circuit's reasoning:
 
 
 44
 Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains. The statute is aimed at the inducement factor.
 
 
 45
 The text refers to "any remuneration." That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended. "Remunerates" is defined as "to pay an equivalent for service." Webster Third New International Dictionary (1966). By including such items as kickbacks and bribes, the statute expands "remuneration" to cover situations where no service is performed. That a particular payment was a remuneration (which implies that a service was rendered) rather than a kickback, does not foreclose the possibility that a violation nevertheless could exist.
 
 
 46
 United States v. Greber, 760 F.2d 68, 71 (3d Cir.) (emphasis added), cert. denied, 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985); see also United States v. Hancock, 604 F.2d 999, 1001-02 (7th Cir.) (under older statute which did not include "remuneration," rejecting argument that fees for legitimate services could not be illegal kickbacks), cert. denied, 444 U.S. 991, 100 S.Ct. 521, 62 L.Ed.2d 420 (1979).
 
 
 47
 Whether the payments were at least in part for services rendered raises the issue of whether the government must show that such payments were made primarily or solely with a corrupt intent. In Greber, the court held that "[i]f the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services." 760 F.2d at 72 (emphasis added). This "more expansive reading" of the statute, id., implies that the issue of the sole versus primary reason for payments is irrelevant since any amount of inducement is illegal. We need not decide the exact reach of the statute since, in this case, the district court instructed that the defendants could only be found guilty if the payments were made primarily as inducements. At a minimum this comports with congressional intent. Greber, 760 F.2d at 71-72 (collecting and discussing cases).
 
 
 48
 The defendants based their case on the theory that the payments to Felci were only made for actual services performed. This, they contended, was the sole reason for the payments. They, therefore, object to the following instruction:
 
 
 49
 If you find the payments were made for two or more purposes, then the government has to prove that the improper purpose is the primary purpose or was the primary purpose in making and receiving the payments.... You cannot convict if you find that the improper purpose was an incidental or minor one in making the payments.
 
 
 50
 We find that this instruction was not reversible error.
 
 
 51
 The verdicts rendered indicate that the jury followed this instruction. The jury found the defendants guilty on the conspiracy and the two automobile payment charges, and not guilty on all but one check payment, on which they failed to agree. The jury could have believed that the check payments were compensation for work done with only an incidental improper purpose, but that the two automobiles were primarily given for an improper purpose and not for work done.
 
 
 52
 Finally, defendants argue that in light of recent congressional and administrative actions, reasonable payments for actual work is not a crime proscribed by the Medicare Fraud statute. The defendants, however, read too much into the amended statute and subsequent administrative actions. In 1987, Congress repealed 42 U.S.C. Sec. 1395nn and reenacted the provision in altered form at 42 U.S.C. Sec. 1320a-7b. The basic substantive provision for criminal liability has not been materially changed. 42 U.S.C. Sec. 1320a-7b(b)(1) and (2). Under this revision, the Secretary of Health and Human Services (HHS) is directed to promulgate regulations specifying payment practices that shall not be treated as a criminal offense. 42 U.S.C. Sec. 1320a-7b(b)(3)(D). Pursuant to this mandate, the Secretary of HHS initially proposed regulations on December 21, 1988, 53 Fed.Reg. 51,862 (1988), withdrew them on December 23, 1988, 53 Fed.Reg. 52,448 (1988), and reissued them on January 23, 1989, 54 Fed.Reg. 3088 (1989). Under these proposed regulations, a consulting arrangement would be exempted from illegality so long as the amount paid was "consistent with fair market value in arms-length transactions."[19] The regulations have to our knowledge not been adopted; they have only been published for comment.
 
 
 53
 As defendants concede, these proposed changes do not govern their actions since the law was different at the time. They nonetheless contend that the proposed changes should inform our determination of whether reasonable payments for actual services can ever be illegal. Our response is twofold. First, even assuming that the statutory changes and proposed administrative actions show that a later Congress agrees with the defendants that Congress never intended to criminalize the kind of payments involved here, courts are chary of allowing a subsequent Congress' comments on the intent of prior legislation to control. CPSC v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) ("we begin with the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' ") (citation omitted).
 
 
 54
 Second, and more importantly, the relied upon changes in the statute do not support defendants' contentions and may in fact belie them. Congress did not explicitly change the statute to exclude reasonable payments for actual work done. At best, Congress allowed HHS to create "safe harbors" for certain types of transactions. The proposed regulation does not exempt every transaction in which the amount paid for services is an amount "consistent with fair market value;" rather, it exempts only a small subset of such transactions. To qualify, there must also be: (1) an agreement in writing; (2) specifying the services to be rendered; (3) for a term of more than one year; (4) with the compensation set in advance. Furthermore, under circumstances such as the present case where the consulting arrangement is not full-time, even more stringent requirements are necessary to meet the exemption from criminal liability.[20] HHS has thus decided not to create a safe harbor for transactions such as the present case. While we need not decide whether this implies that HHS deems such transactions to be illegal, we certainly do not see how this shows that HHS finds such transactions to be legal.
 
 
 55
 Moreover, the fact that Congress, in reenacting the substantive sections of the Medicare Fraud statute did not change them, implies that Congress approved prior interpretations such as Greber, 760 F.2d 68. See, e.g., Sierra Club v. Secretary of Army, 820 F.2d 513, 522 (1st Cir.1987); see also United States v. Tapert, 625 F.2d 111, 121 (6th Cir.) ("An amendment to an existing statute is not an acknowledgement by Congress that the original statute is invalid."), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 610, 66 L.Ed.2d 496 (1980).B. Unconstitutionally Vague Statute
 
 
 56
 Defendants next claim that, if we read the Medicare Fraud statute to criminalize, under certain circumstances, reasonable payment for services rendered, the statute becomes unconstitutionally vague.
 
 
 57
 The Supreme Court has set forth the standards for determining whether a statute is void for vagueness:
 
 
 58
 A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.
 
 
 59
 Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330-31, 96 L.Ed. 367 (1952) (footnotes omitted). More recently, the Court has expanded this teaching.
 
 
 60
 In Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court enunciated the twin values offended by vague statutes: (1) vague laws do not provide fair warning to the public; and (2) vague laws contribute to arbitrary and discriminatory enforcement and application. Id. at 108-09, 92 S.Ct. at 2298-99. Defendants argue only that the statute undercuts the notice prong; they do not argue that there has been arbitrary and discriminatory enforcement.
 
 
 61
 In Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-500, 102 S.Ct. 1186, 1193-94, 71 L.Ed.2d 362 (1982), the Court elaborated on the relevant factors for deciding vagueness. First, an "economic regulation is subject to a less strict vagueness test." Id. Second, there is "greater tolerance of enactments with civil rather than criminal penalties." Id. at 498-99, 102 S.Ct. at 1193. Third, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the [defendant] that his conduct is proscribed." Id. at 499, 102 S.Ct. at 1193. "Finally, perhaps the most important factor ... is whether [the law] threatens to inhibit the exercise of constitutionally protected rights." Id. The court has also warned against "mechanically appl[ying]" the standards. Id. at 498, 102 S.Ct. at 1193. In Maynard v. Cartwright, --- U.S. ----, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988), the Court held that outside of the realm of the first amendment, vagueness challenges are "judged on an as-applied basis."
 
 
 62
 When the Medicare Fraud statute is analyzed under the applicable standards, and in light of the fact that inducement is the gravamen of the offense, the statute passes constitutional muster even though the criminal nature of the statute requires "a relatively strict test" for constitutionality. Hoffman Estates, 455 U.S. at 499, 102 S.Ct. at 1194. First, there can be no doubt that the statute is an economic regulation which allows for greater latitude by Congress--the Medicare Fraud statute is directed at drains on the public fisc. See Greber, 760 F.2d at 71; Hancock, 604 F.2d at 1001.[21] Second, the statute is not the type that can be used to chill constitutionally protected rights and defendants do not so claim. Third and most importantly in this case is the factor of scienter. Under the Medicare Fraud statute, there is the standard requirement of knowing and willful acts. 42 U.S.C. Sec. 1395nn. The key to a Medicare Fraud case is the reason for the payment--was the purpose of the payments primarily for inducement. In addition to the knowing and willful requirement, this imposes a second and stronger scienter requirement. The unusually high scienter requirement "mitigate[s] [any] vagueness, especially with respect to the adequacy of notice to the [defendant] that his conduct is proscribed." Hoffman Estates, 455 U.S. at 499, 102 S.Ct. at 1193.[22]
 
 C. Failure to Instruct re Mens Rea
 
 63
 The defendants next contend that the court's failure to instruct that the reasonableness of the payments to Felci was evidence of a lack of the mens rea element of the crime, that it was not committed knowingly and willfully, was a violation of due process.
 
 
 64
 Defendants did not object to the court's failure to give this particular instruction after the jury was initially instructed. After the charge, the defendants registered a general objection to all instructions not given. This is insufficient. See Carrillo v. Sameit Westbulk, 514 F.2d 1214, 1218-19 (1st Cir.1975) (discussing Fed.R.Civ.P. 51, the civil procedure analogue to Fed.R.Crim.P. 30); see also United States v. Monteiro, 871 F.2d 204, 208 (1st Cir.1989) ("Defendant's objections to the jury instructions were repeated after the instructions were given as required by this Circuit."). There followed a series of objections on various specific instructions, none of which dealt with the present issue. Under such circumstances, the omission will only be reviewed for plain error. See, e.g., United States v. Sedlak, 720 F.2d 715, 721 (1st Cir.1983), cert. denied, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). Here, we see no error, much less plain error. The judge gave an appropriate explanation of the scienter element of the crime:
 
 
 65
 The fourth element I told you is that the defendants have to act, have to have been shown to have acted knowingly and willfully. Knowingly simply means to do something voluntarily, to do it deliberately, not to do something by mistake or by accident or even negligently. Willfully means to do something purposely, with the intent to violate the law, to do something purposely that law forbids.
 
 
 66
 The judge told the jurors that in deciding this issue, the defendants' conduct and statements including the circumstances surrounding the conduct and statements were relevant. Since the entire defense revolved around the defendants' actions and the reasons for them, we see no error in the court refusing to instruct explicitly every aspect of the defense.
 
 
 67
 IV. PAYMENTS FROM MEDICARE FUNDS AS JURISDICTIONAL REQUIREMENT
 
 
 68
 Next the defendants argue that the two substantive counts involving the automobiles should be dismissed since the government failed to prove that they were purchased with Medicare funds and thus there is no federal jurisdiction. Defendants misread the statute. The statute requires only that the payment be made "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. Sec. 1395nn(b). The Medicare federal jurisdictional nexus is found elsewhere in the statute--in the purchasing or recommending the purchasing of services which are paid for by Medicare funds. See 42 U.S.C. Sec. 1395nn(b)(1)(B) (remuneration is illegal when it is given in exchange for recommending the purchase of a service for which the "payment may be made in whole or in part under this subchapter"); cf. United States v. Ruttenberg, 625 F.2d 173, 177 (7th Cir.1980) (discussing similar issue with respect to 42 U.S.C. Sec. 1396). Under defendants' theory, the government would have to trace commingled funds to their source. A small example of this is present in this case: the automobiles were purchased not by Bay State but by other corporations, a realty corporation and an ambulance dealership, that were not direct recipients of Medicare funds. The plain language of the statute does not require the government to show that Medicare funds were in fact used to make the illegal payment.
 
 
 69
 V. FAILURE TO INSTRUCT ON DIFFERENCE BETWEEN PAYOR AND PAYEE
 
 
 70
 Felci complains that in several respects the court failed to distinguish between payors and payees in its charge by not adding certain requirements in order to find a payee, such as Felci, guilty. Felci failed, however, to properly object to these instructions. Felci's failure to object in a timely fashion means we examine the instructions for plain error only. The reason for giving post-instruction objections was illustrated in this case. The district judge did in fact correct one instruction after an error in it was pointed out.
 
 
 71
 We note first that the two subsections criminalizing receipt of payments and the payment of them are in all substantive respects identical. 42 U.S.C. Sec. 1395nn states (emphasis added):
 
 
 72
 (b) Illegal remunerations
 
 
 73
 (1) Whoever knowingly and willfully solicits or receives ...
 
 
 74
 (2) Whoever knowingly and willfully offers or pays any remuneration....
 
 
 75
 This is strong evidence that Congress meant the crimes to have the same elements for payor and payee. See, e.g., Barnson v. United States, 816 F.2d 549, 554 (10th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987).
 
 
 76
 There are two basic contentions raised by Felci. The first is that the government must prove that the payee actually performed the improper acts for which he was paid. We disagree. The government need not show that one accepting a payment for an illegal purpose actually carried through on his promise. See e.g., United States v. Brewster, 408 U.S. 501, 526, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972) (under 18 U.S.C. Sec. 201, "acceptance of the bribe is the violation of the statute, not performance of the illegal promise"); see also United States v. Gjieli, 717 F.2d 968, 973 (6th Cir.1983) (under 18 U.S.C. Sec. 201, there is no need to show that the person accepting the bribe could actually effect the object of the bribe), cert. denied, 465 U.S. 1101, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984); United States v. Jannotti, 673 F.2d 578, 601 (3d Cir.) (under Hobbs Act, a bribe is still illegal even if the bribee might have, without the bribe, made legally and properly the same recommendation on the basis of available information), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).
 
 
 77
 Second, Felci contests the district court's use of the word "recommending" rather than the full statutory language of "purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing or ordering."[23] The court repeatedly used phrases such as: "arranging for or recommending"; "to recommend"; "to arrange for or recommend." The evidence was that Mundy, the hospital CEO, had final authority to award the contract; the bid committee was only to recommend a choice. Because of this, the government tried the case on a recommendation theory and that was how the judge instructed the jury.[24] There was no plain error in the judge's instruction.
 
 VI. FELCI AS A MERE SUBORDINATE
 
 78
 Felci next contends that the Medicare statute was not meant to reach subordinate, minor actors such as himself. Even assuming Felci was such an actor--a tenuous assumption given Felci's unique experience and position with respect to the ambulance contracts--we think that the statute does reach minor actors. The language of the statute makes no distinction on the basis of control or extent of participation. Indeed, the phrase "purchasing, leasing, ordering or arranging for or recommending purchasing, leasing, or ordering" (emphasis added) in the statute implies that one need not be in a position of control in order to be guilty of Medicare Fraud. Felci points to nothing in the legislative history to suggest that Congress intended otherwise. Furthermore, case law does not require a bribee to be a major player or in control of the transaction in order to be found guilty. See Gjieli, 717 F.2d at 973. Felci's reliance on the Judge Jones' concurrence in United States v. Tapert, 625 F.2d at 121-23, is misplaced. That case dealt with an earlier version of the Medicaid Fraud statute which was significantly different from the statute at issue here. Compare Tapert, 625 F.2d at 113 n. 1 with note 1 supra. It seems clear that a mere bit player may be guilty of Medicare Fraud.
 
 VII. PATTERN OF JURY VERDICTS
 
 79
 Felci next argues that the pattern of jury verdicts--guilty on the conspiracy, guilty on the two automobile counts, no verdict on one check count, and not guilty on six check counts--shows that the jury rejected the government's theory and convicted Felci for conduct which is not an offense. Even assuming an inconsistency, this would not warrant a reversal of the convictions. "Inconsistency in a verdict is not a sufficient reason for setting it aside." Harris v. Rivera, 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) (per curiam). This is true even when there is an "inconsistency between verdicts on separate charges against one defendant." Id. (citing Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932)). Realizing this, Felci argues that the pattern was such that the jury must have convicted Felci on a theory which is not a crime under the Medicare Fraud statute or on a theory that was not charged. Such a conviction would, of course, require reversal. See Eaton v. Tulsa, 415 U.S. 697, 699, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693 (1974) (per curiam); United States v. Varoz, 740 F.2d 772, 775 (10th Cir.1984); United States v. Porter, 591 F.2d 1048, 1054 (5th Cir.1979). But that is not the situation here.
 
 
 80
 Each payment was a separate count in the indictment. The government sought to prove that each payment was made primarily for an illegal purpose. In rejecting the theory that all the payments were for illegal purposes, the jury showed a careful discrimination among the evidence presented. The counts on which Felci was acquitted involved checks from Bay State[25] to EMSTAT after the contract was awarded and during a period in which EMSTAT and Felci were in fact providing or attempting to provide services to Bay State. The jury could have decided that these check payments, which were disclosed clearly in Bay State's books, were meant only as compensation and not to induce a recommendation on a contract that was already awarded. The substantive counts on which Felci was found guilty involved two automobiles. Both were purchased by companies other than Bay State and then given to Felci. The Buick[26] was given prior to the contract being awarded and the Mazda was given on the day after the contract was signed. The jury could have decided that these two payments, made in such a way as to not be shown on Bay State's books, were primarily meant as inducements, with the Buick being an advance and the Mazda being the final payment upon completion of the deal. The count on which the jury reached no verdict involved a hybrid of these two situations: a check from Bay State but made prior to the awarding of the contract.
 
 
 81
 The pattern of jury verdicts was not inconsistent with either the government's or the defendants' theories of the case but shows rather that the jury believed the government in part and the defense in part. That the jury did not believe the government with respect to the checks does not make the automobile payments legal. It is axiomatic that a jury has the right to pick and choose the evidence it believes.
 
 VIII. SUFFICIENCY OF THE EVIDENCE
 
 82
 The final argument by appellants is the sufficiency of the evidence. In order to prove its claims against Bay State and Kotzen, the government had to show (1) a conspiracy to commit Medicare Fraud and (2) that Bay State and Kotzen knowingly and willfully gave Felci the two automobiles primarily as an inducement for his recommending that Bay State be awarded the 1984 QCH contract for which Bay State received some Medicare funds as reimbursement. The proof against Felci had to be similar except the government had to show his receipt of the payments. "When reviewing a verdict for sufficiency of evidence, all reasonable inferences must be drawn in the light most favorable to the government. It is also beyond dispute that a jury may find guilt beyond a reasonable doubt from circumstantial evidence." United States v. Fields, 871 F.2d 188, 199 (1st Cir.1989) (citations omitted). Based on a thorough review of the record, already set forth in detail, we find that the evidence was sufficient to find the defendants guilty of the charges on which the jury so found them.
 
 CONCLUSION
 The convictions appealed from are
 
 83
 Affirmed.
 
 
 
 [1]
 This statute reads in relevant part:
 (b) Illegal remunerations
 (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
 * * *
 (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,
 shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
 (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
 * * *
 (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,
 shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
 In 1987, after the time period relevant to this case, the section was repealed and reenacted in modified form as 42 U.S.C. Sec. 1320a-7b(b).
 
 
 [2]
 The counts described in the text are the counts in the government's superseding indictment. Originally, the defendants had also been charged with various other counts including mail fraud and making false statements
 
 
 [3]
 In his brief, Felci adopted "the arguments advanced by appellants Bay State and Kotzen as additional grounds for this appeal."
 
 
 [4]
 Front-Line Service is service in which a private ambulance company is the first company sent to respond to medical emergencies, such as 911 calls
 
 
 [5]
 A zero-subsidy contract is a contract under which the party rendering a service is not paid by the other party, but rather agrees to bill others. For example, a city and an ambulance company might enter into a zero-subsidy contract under which the ambulance company provides the emergency medical needs of the city and agrees to bill those who are transported, rather than the city. In addition to being a zero subsidy contract, there was also a special provision for not charging indigents
 
 
 [6]
 This was QCH's third CEO in as many years
 
 
 [7]
 Advanced Life Saving (ALS) is an advanced form of first aid administered by highly trained ambulance personnel who are in radio contact with doctors at the hospital
 
 
 [8]
 Although the 1984 contract was to begin on July 1, 1984, the October 1, 1984 date for ALS coincided with the date of graduation for a class of Emergency Medical Technicians (EMTs) at a QCH course on ALS techniques. Mainly Bay State employees were enrolled in this course
 
 
 [9]
 Although both Bay State and Brewster entered zero-subsidy contract bids, Brewster argued that its lower rates would save Quincy residents hundreds of thousands of dollars over the life of the three-year contract
 
 
 [10]
 A company may charge any rate it chooses for services rendered; this is called the "actual rate." A company's "customary rate" is the median of all its actual charges during a time period. The "prevailing rate" is a rate determined by looking at all charges by all servers in a geographical area during a time period. The prevailing rate is the most Medicare will reimburse for services rendered; Medicare may reimburse less than that amount depending on the actual charge and the company's customary rate
 
 
 [11]
 Gonsalves was not an employee of Bay State; rather he was independently, along with Felci, working on a computer program to meet Bay State's needs. The program was not necessarily meant to be sold only to Bay State. The exact business arrangements will be discussed infra when we address Felci's non-QCH connections with Bay State
 
 
 [12]
 The car was actually purchased by Sales Corp. and title placed in Felci's name. The car was initially listed as a loan to Felci but later was written off as paid by services rendered
 
 
 [13]
 This check was made out to EMSTAT Management Co. The other checks discussed infra were made out to EMSTAT Management Co., EMSTAT or EMSTAT Management. For convenience, we will refer to them as being made out to EMSTAT
 This particular check, unlike the others, bears not only Felci's endorsement, but Gonsalves' as well. Gonsalves did not sign this check nor did he authorize his endorsement. He did, however, ratify it later on when Felci told him about it, after the criminal investigation started.
 
 
 [14]
 This car was purchased by B & N Realty with title being placed in Felci's name. As with the Buick, this car was also initially listed as a loan to Felci
 
 
 [15]
 This check was written from Kotzen's personal account; Kotzen was later reimbursed by a check from Bay State for this and other payments made by him for corporate purposes
 
 
 [16]
 Bay State was fined $10,000 on the conspiracy count and $5,000 on each substantive count. Kotzen was sentenced to concurrent six month probation terms on each count and fined $10,000 on the conspiracy count. Felci was sentenced to concurrent terms of six month probation on each count and fined $1,000 on the conspiracy count. All sentences were stayed pending appeal
 
 
 [17]
 Kotzen and Bay State have no grounds for challenging the admission of the Outline since they gave it to the FBI
 
 
 [18]
 The record at this point is muddled by the fact that the government, while agreeing that the Outline was not turned over pursuant to a subpoena, kept referring to the substantially similar letter to Gideonse which was not used at trial, but which was obtained by the government pursuant to a subpoena after the Outline had already been turned over to it
 
 
 [19]
 The proposed regulation reads in full:
 (d) Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include payments made by a principal to an agent as compensation for the services of the agent, as long as--
 (1) The agency agreement is set out in writing and signed by the parties;
 (2) The agency agreement specifies the services to be provided by the agent;
 (3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such interval, their precise length, their periodicity, and the exact charge for such intervals;
 (4) The term of the agreement is for not less than one year; and
 (5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner than takes into account the volume or value of any referrals of business between the parties that is reimbursed under Medicare or any State health care program.
 For the purpose of this section, an agent of a principal is any person, other than a bona fide employee, who has an agreement to perform services for or on behalf of the principal.
 
 
 [53]
 Fed.Reg. at 3094
 
 
 [20]
 Under such circumstances, the agency agreement must also specify the exact terms, times and payments for the part-time employment. See note 19, supra
 
 
 [21]
 The defendants argue that there is no drain on the public fisc in this case since ambulance service and Medicare reimbursement would have been required no matter who received the contract. Although the reason for enacting the statute was to prevent drains on the public fisc, the statute does not require that there be a drain on the public fisc in order for payments to be illegal. See note 1, supra. Furthermore, the ambulance service would have been required regardless of who won the QCH contract. But, if Bay State caused Medicare to pay more for such service due to its higher rates than it would have if Brewster won the contract, there would indeed have been a drain on the public fisc. We, of course, do not know if Brewster would have cost less or not in terms of Medicare expenditures since they did not win the contract and thus, we do not know what Brewster's actual charges would have been. See note 10, supra (explaining the Medicare reimbursement rates). We do know that Brewster's rates were in fact lower than Bay State's, and therefore, the award of the contract to Bay State might well have led to an additional drain on Medicare funds
 
 
 [22]
 Defendants reliance on United States v. Kozminski, --- U.S. ----, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) is misplaced. In that case, the Court was addressing the issue of how to define "involuntary servitude." The Court rejected an argument that would allow "judges [to] develop the standards for imposing criminal punishment on a case-by-case basis." Id. 108 S.Ct. at 2764. The Court realized, however, "that some degree of uncertainty exists whenever judges and juries are called upon to apply substantive standards established by Congress." Id. at 2764. In this case, the jury was asked to apply the statutory standard of inducement to the acts of these defendants. This is what Kozminski permits
 Finally, any argument that the subsequent actions of Congress and HHS somehow show that those two groups considered the prior statute unconstitutionally vague is irrelevant. It is uniquely the province of the courts to decide issues of constitutionality. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).
 
 
 [23]
 Felci also argued that the indictment was invalid because it did not track the statutory language. This is unavailing since the indictment clearly informed Felci of the charges against him. See, e.g., United States v. Stefan, 784 F.2d 1093, 1101-02 (11th Cir.), cert. denied, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986); United States v. Chilcote, 724 F.2d 1498, 1505 (11th Cir.), cert. denied, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984)
 
 
 [24]
 Felci's argument that the word "recommending" in the statute is somehow modified by "arranging for" ignores the plain disjunctive wording of the statute: "arranging for or recommending." 42 U.S.C. Sec. 1395nn(b)(1)(B) (emphasis added)
 
 
 [25]
 One check was actually from Kotzen who was reimbursed by Bay State
 
 
 [26]
 We use the term Buick as a shorthand to refer to the purchase of the Buick and trade-in of the Volvo, with Felci receiving a net of over $6,000 in value